KAREN P. HEWITT
United States Attorney
CHRISTOPHER M. ALEXANDER
Assistant U.S. Attorney
California Bar. No. 201352
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7425 /(619) 235-2757 (Fax)
Email: Christopher.M.Alexander@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>CESAR RICARDO FIMBRES-PEREZ (1),<br>OLIVIA FIMBRES-PEREZ (2),<br>MIGUEL FIMBRES-PEREZ (3),<br><br>Defendants. | Criminal Case No. 08CR0021-DMS<br><br>HEARING DATE: March 14, 2008<br>TIME: 11:00 a.m.<br><br>UNITED STATES' MOTION REGARDING FEDERAL DEFENDERS' CONFLICT OF INTEREST AND<br><br>RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION FOR PRODUCTION OF GRAND JURY TRANSCRIPTS.<br><br>TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES |

COMES NOW the plaintiff, the UNITED STATES OF AMERICA, by and through its counsel, KAREN P. HEWITT, United States Attorney, and Christopher M. Alexander, Assistant United States Attorney, and hereby files its Response and Opposition to Defendants' above-referenced motions. This Response and Opposition is based upon the files and records of the case together with the attached statement of facts and memorandum of points and authorities.

## I

## STATEMENT OF THE CASE

On January 2, 2008, a federal grand jury in the Southern District of California returned an Indictment charging Defendant Cesar Ricardo Fimbres-Perez ("Cesar Fimbres") in Count One with aiding the entry of an alien with a prior aggravated felony conviction into the United States in violation of 8 U.S.C. § 1327; Defendant Olivia Fimbres ("Olivia Fimbres") was charged in Counts Two and Three with assaulting a federal officer in violation of 18 U.S.C. § 111(a)(1) and charged in Count Six with aiding the escape of Miguel Fimbres-Perez in violation of 18 U.S.C. § 751(a); and Defendant Miguel Fimbres-Perez ("Miguel Fimbres") was charged in Count Four with assaulting a federal officer in violation of 18 U.S.C. § 111(a)(1) and charged in Count Five with being a deported alien attempting to enter the United States after deportation in violation of 8 U.S.C. § 1326 (collectively, "Defendants"). On January 3, 2008, Defendants Cesar Fimbres and Olivia Fimbres wer arraigned on the Indictment and entered not guilty pleas. The Court set a motion hearing date for February 1, 2008.

On January 17, 2008, Defendant Olivia Fimbres filed a motion to compel discovery. On January 18, 2008, Defendant Cesar Fimbres filed motions to compel discovery, dismiss, and produce transcripts.

On February 1, 2008, the Court continued the matter to February 15, 2008 so that the Parties could address discovery issues. On February 15, 2008, the United States raised the issue of a conflict of interest. The Court requested briefing. The United States now responds to the Court's request.

## II

## STATEMENT OF FACTS

### A. THE APPREHENSION

On December 15, 2007, Border Patrol Agents Luis Ramos and Eric Vito were assigned to an area known as Whiskey 15 position at the Imperial Beach area of operations. Border Patrol Agent Leslie H.

Pino was assigned to the plainclothes Rapid Engagement Support Enforcement Team ("RESET") and was also working in the Whiskey 15 area. All three agents were at Border Field State Park observing a Border Angels rally.

The Whiskey 15 area and Border Field State Park are approximately five miles west of the San Ysidro Port of Entry and adjacent to the United States/Mexico International border. The western border of the Whiskey 15 area and Border Field State park is the Pacific Ocean.

At approximately 5:30 p.m., Agent Ramos observed two individuals enter into the United States without inspection. The two individuals walked a few yards into the United States and then returned to Mexico. The two individuals repeated their actions twice before illegally entering a third time and continuing northbound along the shoreline. Agent Ramos observed that one of the individuals was wearing a yellow striped jacket. Agent Ramos relayed this information via agency radio to Agent Vito and continued to observe the two individuals walking up the beach.

Agent Vito responded to the shoreline to intercept the two individuals but his vehicle became disabled about ten yards north of the United States/Mexico International Boundary. Agent Vito then responded to the two individuals on foot and encountered them directly west of the Border Field State park lower parking lot. The parking lot is approximately 150 yards north of the United States/Mexico International Boundary. Agent Pino also responded to the shoreline and assisted Agent Vito. The two individuals claimed to be "Messing around with the Border Patrol" and did not mean any harm. Both individuals stated that they were United States citizens born in San Diego, California and wanted to return to Mexico. Both individuals spoke fluently in the English language.

Both individuals were escorted to the Border Field State Park lower parking lot in order to perform record checks. The agents and both individuals were met at the lower parking lot by Agent Ramos. Agent Ramos began to interview one of the two individuals later identified as Cesar Fimbres. Agent Vito began to interview the other individual later identified as Miguel Fimbres. Due to the fact that Agent Pino had left his vehicle at Border Field State park near the United States/Mexico International boundary, there was a large crowd of people on the south side of the fence due to the rally, and the fact that Agent Vito's agency vehicle was disabled ten yards north of the United States/Mexico

International boundary Agent Pino returned to his vehicle. Agent Pino secured his vehicle and kept watch over Agent Vito's disabled vehicle.

While being interview by Agent Ramos, Miguel Fimbres began to walk south towards Mexico. Agent Ramos ordered Miguel Fimbres to stop walking south and return to the park's lower parking lot. Miguel Fimbres refused to comply with Agent Ramos' order and stated that he was going to talk to his wife who was in Mexico. Agent Ramos then physically attempted to prevent Miguel Fimbres from returning to Mexico by wrestling Miguel Fimbres to the ground. Miguel Fimbres being a much bigger individual was able to escape Agent Ramos' grasp by getting to his feet, slipping out of his jacket, and running south towards Mexico. Agent Ramos relayed to Agent Pino information concerning the fleeing individual.

Park Ranger Jonathan Irwin of the State of California Department of Parks and Recreation was also present at the Border Field State Park and was observing the two Border Patrol Agents and the Fimbres brothers at the lower parking lot. Irwin was conducting his duties as a park ranger and was preparing to close the park to all civilian traffic. Ranger Irwin observed Agent Ramos' attempts to restrain Miguel Fimbres and observed Miguel Fimbres run southbound towards Mexico. Ranger Irwin pursued Miguel Fimbres in his department issued truck and managed to park in front of the fleeing Miguel Fimbres about twenty feet north of the United States/Mexico International boundary.

Agent Pino responded on foot to the radio transmission that Miguel Fimbres was fleeing the area. Agent Pino intercepted Miguel Fimbres as he ran around the back of Ranger Irwin's truck. As Miguel Fimbres came around the back of the truck, he started to slip and placed his hand on the sand. Miguel Fimbres then assumed a fighting stance. As Agent Pino attempted to apprehend Miguel Fimbres, he head butted Agent Pino in the chest and started to drag Agent Pino towards the United States/Mexico International boundary. Ranger Irwin exited his truck and assisted Agent Pino. However, Miguel Fimbres continued to struggle and would not comply with commands to stop resisting. Miguel Fimbres continued to crawl and slowly inched his way closer to the United States/Mexico International boundary.

Agent Ramos arrived on foot to assist in the arrest of Miguel Fimbres. Miguel Fimbres continued to struggle with both agents and the park ranger. At this point a female, later identified as

Olivia Fimbres, entered the United States without inspection by running across the United States/Mexico International boundary. Olivia Fimbres started to yell "Leave him alone. Let him go back to Mexico. He's my husband." Olivia Fimbres also started to pull both agents and the park ranger from Miguel Fimbres. Olivia Fimbres began to assist Miguel Fimbres in his struggle by pushing him south and interfering with the two agents and the park ranger. Agents Pino and Ramos both pulled Olivia Fimbres off of her husband numerous times and ordered her to stop interfering with federal agents while attempting to perform their official duties. Olivia Fimbres disobeyed the agents' commands to stay away from them and continued to pull them off of Miguel Fimbres. As the agents and the park ranger tried to pull Miguel Fimbres away from the fence, Olivia Fimbres grabbed Agent Pino's right arm numerous times. This cause Agent Pino to lose his grip on Miguel Fimbres. Olivia Fimbres also attempted to push Agent Pino and Agent Ramos away from Miguel Fimbres.

This made it impossible for the agents to pull Miguel Fimbres away from the fence. Because Miguel Fimbres continued to struggle and Olivia Fimbres was interfering with his arrest, Agent Pino deployed his agency issued oleoresin capsicum spray into the face of Miguel Fimbres. The oleoresin capsicum spray did not have any immediate effect on Miguel Fimbres and he continued to struggle south towards Mexico. Agent Pino also attempted to spray his oleoresin capsicum spray into the eyes of Olivia Fimbres, but the can was empty.

At the same time that Olivia Fimbres arrived at the scene, approximately a dozen other individuals from Mexico also arrived. The onlookers began to scream at the agents attempting to arrest Miguel Fimbres. When Miguel Fimbres grabbed the metal pillars that are on the United States/Mexico International boundary, the onlookers grabbed his arms and tried to pull him back into Mexico. A short tug of war ensued between the two agents, park ranger and the onlookers before Miguel Fimbres was pulled into Mexico.

Once Miguel Fimbres returned to Mexico, Agent Pino placed Olivia Fimbres into custody for impeding federal agents attempting to arrest Miguel Fimbres.

Olivia Fimbres and Cesar Fimbres were transported to the Imperial Beach Border Patrol Station for processing.

At the station, agents found through record checks that the individual who returned to Mexico was Miguel Fimbres. Miguel Fimbres had given his name and date of birth to agents before running back to Mexico. Miguel Fimbres has an extensive criminal record and immigration history.

Agents also located a California drivers license under the name Miguel Mauricio Fimbres. The picture associated with CA A5512603 was positively identified by Agents Pino, Ramos, and Vito as the individual that was observed entering into the United States illegally, spoke with agents, and ultimately returned to Mexico after struggling with agents.

**B. <u>CESAR FIMBRES' STATEMENTS</u>**

Field Operations Supervisor Brian Axthelm read Cesar Fimbres his <u>Miranda</u> rights at approximately 11:00 p.m. as witnessed by Border Patrol Agent Joel Lara.

**C. <u>CESAR FIMBRES' CRIMINAL HISTORY</u>**

Cesar Fimbres has two outstanding warrants from San Diego County. The warrants were for possess of a controlled substance in violation of Health and Safety Code 11377(A) and possess control substance paraphernalia in violation of Health and Safety Code 11364.

**D. <u>OLIVIA FIMBRES' STATEMENTS</u>**

Field Operations Supervisor Brian Axthelm read Olivia Fimbres her <u>Miranda</u> rights at approximately 11:47 p.m. as witnessed by Border Patrol Agent Joel Lara.

**E. <u>OLIVIA FIMBRES' CRIMINAL HISTORY</u>**

Olivia Fimbres has no identifiable criminal history.

**F. <u>MIGUEL FIMBRES' CRIMINAL AND IMMIGRATION HISTORY</u>**

Miguel Fimbres' criminal history dates back almost 20 years. Without discussing every conviction, Defendant was convicted of importation of marijuana in violation of 21 U.S.C. §§ 952 and 960 in 1989. In 1992, he was convicted on voluntary manslaughter and child cruelty. He received a more than 11 years in prison for this conviction. Most recently, in 2001, Defendant was convicted of being a deported alien found in the United States in violation of 8 U.S.C. § 1326. He received 37 months in prison and three years supervised release.

Defendant was ordered deported on August 27, 1999.

## III

## THE CONFLICT IS CLEAR

Defense counsel confuses many theories to arrive at the conclusion that no conflict of interest exists. The Ninth Circuit has recently reminded courts, lawyers, and defendants of the perils of conflicted counsel. See United States v. Elliot, 444 F.3d 1187 (9th Cir. 2006) (affirming the district court's granting of a mistrial due to the fact that the defense counsel had formerly represented a government witness, and had not received a waiver from the defendant or from the government witness). Indeed, "few aspects of our criminal justice system are more vital to the assurance of fairness than the right to be defended by counsel, and this means counsel not burdened by a conflict of interest." United States v. Henke, 222 F.3d 633, 638 (9th Cir.2000) (per curiam).

### A. Introduction

The Supreme Court has made clear that "a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel." Wheat v. United States, 486 U.S. 153, 160 (1988). "District judges have 'substantial latitude' in deciding whether counsel must be disqualified." United States v. Frega, 179 F.3d 793, 800 (9th Cir. 1999). "Substantial latititude is necessary to avoid the district court being whipsawed – damned if it does and damned if it doesn't." United States v. Stites, 56 F.3d 1020, 1024 (9th Cir. 1995). In Wheat, the Supreme Court held that district courts should disqualify conflicted counsel sooner rather than later, even if the conflict is only a potential one. 486 U.S. at 163. "Were it otherwise, 'trial courts confronted with multiple representations would face the prospect of being whip-sawed by assertions of error no matter which way they rule.'" United States v. Kenney, 911 F.2d 315, 321 (9th Cir. 1990) (quoting Wheat, 486 U.S. at 161); see also United States v. Vasquez, 995 F.2d 40, 42 (5th Cir. 1993) (upholding district court's disqualification of an attorney due to a potential conflict, even though both the defendant and the witness consented to conflict); United States v. Stout, 723 F. Supp. 297, 312 (E.D. Penn. 1989) ("The Supreme Court's decision in Wheat permits me the discretion to act before an actual conflict of interest surfaces at trial, where the likelihood of prejudice to the defendant is particularly high."); United States v. Jones, 623 F. Supp. 110, 114 (E.D. Penn. 1983) (disqualifying counsel because "a conflict is very likely to materialize during these proceedings" due to counsel's previous representation).

Ms. Betancourt's representation, as a member of Federal Defenders of San Diego, Inc., of Cesar Fimbres constitutes a conflict, both on simultaneous and successive grounds.

**B. Simultaneous Representation**

An attorney has a duty of loyalty not only to his own clients, but also to all of his or her firm's clients. See United States v. Rodrigues, 347 F.3d 818, 824 (9th Cir. 2003) (citing ABA Model Rule 1.10, comment [6] ("A firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client."). "The scope of this duty is equivalent to the duty of loyalty to an attorney's own client and, when in conflict with the interests of another client, has the same potential to adversely affect the quality of representation." Id. Moreover, there is no distinction under Ninth Circuit law "between direct and imputed conflicts." Id.; see also Reynolds v. Chapman, 253 F.3d 1337, 1343 (11th Cir.2001) (assuming, without deciding, that an imputed conflict can be an actual conflict); United States v. Gallegos, 39 F.3d 276, 278 (10th Cir.1994) (same); Salam v. Lockhart, 874 F.2d 525, 528 (8th Cir.1989) (same). "Whether an alleged conflict is direct or imputed, 'actual conflict' is a term of art defined by reference not to the nature of the alleged conflict itself, but to the effect of the conflict on the attorney's ability to advocate effectively." Rodrigues, 347 F.3d at 824.

Ms. Betancourt still has an obligation to Miguel Fimbres. She has even made efforts to contact Miguel Fimbres. Miguel Fimbres is charged in the Indictment. If Cesar Fimbres is convicted in this case, he may wish to cooperate with the United States and provide evidence that incriminates Miguel Fimbres. The Sixth Amendment forbids even the possibility of that occurring.

**C. Successive Representation**

With regard to the "duty of loyalty, an attorney-client relationship continues after formal representation ends." Damron v. Herzog, 67 F.3d 211, 215 (9th Cir. 1994). The Supreme Court noted in Strickland that the prejudice requirement is presumed when there has been "[a]ctual or constructive denial of the assistance of counsel altogether." Strickland v. Washington, 466 U.S. 668, 692 (1984). Such a denial occurs when counsel breaches a duty of loyalty owed to the client by representing conflicting interests. See id.; Cuyler v. Sullivan, 446 U.S. 335, 345-50 (1980). Accordingly, Ms. Betancourt, as a member of Federal Defenders, cannot continue to represent the interests of Cesar Fimbres.

Even if Miguel Fimbres faced no additional charges, Ms. Betancourt's representation of Cesar Fimbres is an impermissible successive representation. See Mannhalt v. Reed, 847 F.2d 576, 580 (9th Cir. 1988). When successive representation is at issue, "[t]he relevant test for disqualification is whether the former representation is 'substantially related' to the current representation." Trone v. Smith, 621 F.2d 994, 998 (9th Cir. 1980). Cases are "substantially related" if "the factual contexts of the two representations are similar or related." Id. "[A]n attorney must be disqualified if he or she formerly represented an adverse party in a manner 'substantially related' to the current representation." United States v. Koon, 34 F.3d 1416, 1437 (9th Cir. 1994) (emphasis added) (citation omitted), overruled on other grounds, 518 U.S. 81 (1996). "If there is a reasonable probability that confidences were disclosed which could be used against the former client in the later adverse representation, moreover, a substantial relationship between the two cases will be presumed." Thomas v. Municipal Court, 878 F.2d 285, 288 (9th Cir. 1989). If the cases are substantially related, then an attorney's representations that he did not receive confidential information from his former client are irrelevant: "[E]ven if there is no sharing of confidences, the substantial relationship between the two representations is itself sufficient to disqualify." Koon, 34 F.3d at 1437.

The strict rules prohibiting successive representation exist for good reason. The fact that a lawyer might "change sides" after representing a party prevents that party from communicating fully with the lawyer. As the Ninth Circuit explained in Trone:

> Both the lawyer and the client should expect that the lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of client and in undertaking representation on the client's behalf. That professional commitment is not furthered, but endangered, if the possibility exists that the lawyer will change sides later in a substantially related matter. Both the fact and the appearance of total professional commitment are endangered by adverse representation in related cases.

621 F.2d at 998-99; see also Thomas, 878 F.2d at 289 ("The interest to be preserved by preventing attorneys from accepting representation adverse to a former client is the protection and enhancement of the professional relationship in all of its dimensions.").

1. The Elements

The essential elements of a violation of 8 U.S.C. § 1327 are:

A. Defendant knowingly aided or assisted the alien to enter the United States;

B. Defendant knew that the alien was inadmissible; and

C. The alien was inadmissible under Title 8 United States Code section 1182(a)(2) or (3).

See United States v. Flores-Garcia, 198 F.3d 1119, 1121 (9th Cir. 2000); see also United States v. Figueroa, 165 F.3d 111, 113 (2d Cir. 1998).

2. The Law Regarding Knowledge of Inadmissibility

To proved the element that a defendant knew that the alien was inadmissible, the United States is only required to show that the defendant knew the alien was inadmissible under § 1182 for any reason. See Flores-Garcia, 198 F.3d at 1121. For example, in Flores-Garcia, 198 F.3d at 1121, the defendant admitted that he knew that the alien was without documents to enter the United States. The Ninth Circuit held that the defendant's admission was sufficient knowledge that the alien was "inadmissible" under § 1182(a)(7) and affirmed the defendant's § 1327 conviction. Not only is an alien without documents to enter the United States inadmissible, a deported alien is also inadmissible. See 8 U.S.C. § 1182(a)(9)(A)(i).

3. The Law Regarding Inadmissibility

Section 1182(a)(2)(A)(i)(I) makes inadmissible "any alien convicted of, or who admits having committed or who admits committing acts which constitute the essential elements of– (I) a crime involving moral turpitude. . . ." Whether a statute defines a crime involving moral turpitude is a question of law. United States v. Chu Kong Yin, 935 F.2d 990, 1003 (9th Cir. 1991). In making this determination, courts are to consider "the elements or nature of a crime as defined by the relevant statute, not the actual conduct that led to the conviction." Gonzalez-Alvarado v. INS, 39 F.3d 245, 246 (9th Cir. 1994).

Typically, crimes of moral turpitude involve fraud. See Grageda v. INS, 12 F.3d 919, 921 (9th Cir. 1993). However, the Ninth Circuit has included in this category acts "of baseness or depravity contrary to accepted moral standards," Grageda, 12 F.3d at 921 (quotation omitted), such crimes involve moral turpitude "by their very nature." See id. at 922. "A crime involving the willful commission of a base or depraved act is a crime involving moral turpitude, whether or not the statute requires proof of evil intent." Gonzalez-Alvarado, 39 F.3d at 246. The Ninth Circuit has acknowledged several crimes

involving acts of baseness or depravity -- such as "murder, rape, robbery, kidnaping, voluntary manslaughter, some involuntary manslaughter offenses, aggravated assaults, mayhem, theft offenses, spousal abuse, child abuse, and incest" -- have been found to be turpitudinous even absent the element of fraud. Matter of Lopez-Meza, 22 I. & N. Dec. 1188, 1193 (BIA 1999); see also Grageda, 12 F.3d at 922 (spousal abuse); Guerrero de Nodahl v. INS, 407 F.2d 1405, 1406-07 (9th Cir. 1969) (child abuse). With his voluntary manslaughter conviction, Miguel Fimbres is inadmissible for being convicted of a crime of moral turpitude.

Next, in Vargas-Hernandez v. Gonzales, 497 F.3d 919, 923 (9th Cir. 2007), the Ninth Circuit held that "the voluntary manslaughter conviction [Cal. Penal Code 192] was properly used to find Vargas removable under INA § 237(a)(2)(A)(iii) for having been convicted of an aggravated felony."

As previously found by Judge Miller and affirmed on appeal, Miguel Fimbres is an aggravated felon due to his conviction for voluntary manslaughter in violation of Penal Code 192(a) (not to mention his conviction for willful cruelty to a child in violation of Penal Code 273a(1)).[1/] In its sentencing documents, Federal Defenders agreed "[t]he parties and the probation officer agree that the Court should adjust the base offense level in this case 16 levels upward to reflect Mr. Fimbres-Perez's conviction reported at PSR 4:24-5:13."[2/] The section cited applies to Miguel Fimbres' 192(a) and 273a(1) convictions.[3/] As a matter of law, Miguel Fimbres' convictions after a jury trial are crimes of moral turpitude. Therefore, if the jury finds that Miguel Fimbres is an alien that was convicted of voluntary manslaughter, then Miguel Fimbres is inadmissible under Title 8 United States Code Section 1182(a)(2) or (3).[4/]

---

[1/] A true and correct copies of the Order Denying Miguel Fimbres' Motion to Dismiss and the Memorandum Decision are attached as Exhibit 1 and 2, respectively.

[2/] A true and correct copy of Miguel Fimbres' Sentencing Memorandum is attached as Exhibit 3.

[3/] A true and correct copy of Miguel Fimbres'Presentence Report will be provided upon request.

[4/] Although not charged in the Indictment, Miguel Fimbres is inadmissible under Section 1182(a)(2)(B) states "any alien convicted of 2 or more offense . . . for which the aggregate sentences to confinement were 5 years or more is inadmissible." Miguel Fimbres was convicted of voluntary manslaughter in violation of Penal Code 192(a) and willful cruelty to a child in violation of Penal Code 273a(1). The aggregate sentences were over 11 years making him inadmissible.

Considering that Miguel Fimbres entered a guilty plea to being a previously deported alien and admitted to being an aggravated felon, and that Cesar Fimbres is already asserting Miguel Fimbres in not an aggravated felon, there is little doubt that the representation here is adverse. Will Ms. Betancourt be able to ethically assert Cesar Fimbres does not know Miguel Fimbres when Miguel Fimbres acknowledges such in his Presentence Report? Or he does not know Miguel Fimbres was an alien when Miguel Fimbres admitted it previously? Or he does not know Miguel Fimbres was inadmissible when Miguel Fimbres admitted to being deported previously?

Appointing new counsel when Miguel Fimbres is arrested does not remove Ms. Betancourt's conflict of interest. Courts have routinely rejected similar suggestions from conflicted counsel. As one court put it, "[w]e are not sure that this will be quite the miracle cure that [the defense attorney] seems to think it will be." United States v. Sanders, 688 F. Supp. 373, 374 (N.D. Ill. 1988) (rejecting proposal for non-conflicted counsel to conduct cross-examination). For example, in United States v. Cheshire, 707 F. Supp. 235, 240 (M.D. La. 1989), the defense attorney formerly represented a key Government witness, and tried to use a substitute counsel to cross-examine the Government witness. The court rejected that proposal:

> [The] proposed solution – have a separate lawyer cross examine [the government witness] – does not eliminate the conflict. At the very least, in order to represent his present client [the defendant's attorney] must be completely free and unfettered to analyze, characterize and repudiate the testimony of his former client in closing argument. Moreover, this judge views it as an almost impossible task for a lawyer to participate throughout the course of a trial but not suggest a single question or style of cross examination of the most important witness against his present client.

Cheshire, 707 F. Supp. at 240; see also United States v. Miranda, 936 F. Supp. 945, 951-52 (S.D. Fla. 1996) (rejecting "backup" proposal of having another attorney assist conflicted counsel).

Defense counsel may assert that this situation is no different from a defendant entering a guilty plea and later asserting a different position. However, this is not a motion based upon what the defendant may do in subsequent prosecutions with the same counsel. For example, the United States may not use collateral estoppel to conclusively prove an element of an offense and prevent the defendant

---

Section 1182(a)(2)(C)(i) makes inadmissible any alien that "has been an illicit trafficker in any controlled substance . . . ." Miguel Fimbres was convicted of importation of marijuana in violation of 21 U.S.C. §§ 952 and 960.

from offering contrary evidence. See United States v. Smith-Baltiher, 424 F.3d 913, 921 (9th Cir. 2005) (permitting a defendant to argue that he was a United States citizen despite an earlier guilty plea). Rather, the motion is based upon what ethical obligations defense counsel have to their clients and the court. May a defense counsel take a position that may be adverse to a client's interests or that is frivolous? It is the client, not the defense counsel, that decides what defenses to assert. It is the client, not the defense counsel, that must waive a conflict. It has not happened here.

**D. Integrity of Judicial Process**

Conflicts such as exist in this case affect not only the parties to this case, but also the integrity of the judicial process. "[F]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat, 486 U.S. at 160; see also United States v. Rewald, 889 F.2d 836, 858 n.19 (9th Cir. 1989) ("The Supreme Court's Wheat decision teaches that an actual or potential conflict of interest poses a serious challenge indeed to the integrity of the judicial process."); United States v. James, 708 F.2d 40, 46 (2d Cir. 1983) (affirming disqualification because "[t]he integrity of our system of justice" demanded it); Dolan, 570 F.2d at 1182 ("the public interest in ferreting out criminal activities, along with the need to enforce attorneys' ethical conduct, have been held to outweigh the defendant's choice of counsel"); United States v. Ring, 878 F. Supp. 134, 139 (C.D. Ill. 1995) (disqualifying counsel despite valid waiver in part because "the public has an important interest in the integrity of the trial process").

As Ninth Circuit law demonstrates, Ms. Betancourt's representation of Cesar Fimbres raises these concerns. For example, in United States v. Stites, 56 F.3d 1020 (9th Cir. 1995), a defense attorney represented defendant Dark. Defendant Dark pleaded guilty, and the defense attorney blamed Dark's misdeeds on co-defendant Stites at sentencing. The defense attorney then turned around and tried to represent Stites. Judge Keep disqualified the defense attorney, and the Ninth Circuit agreed. "[E]ven if a certain insincerity may accompany the filling of an advocate's role, nothing in our professional ethics permits an advocate to tell a court one set of facts today and a contradictory set of facts tomorrow." Stites, 56 F.3d at 1025-26 (holding that defense counsel could not tell the court that a person "was a liar, a thief, and the mastermind of the massive fraud charged by the government and then

represent that same person contending that he was innocent of the crimes charged"); see also id. ("as an attorney and officer of the court," the defense attorney could not argue that she "was offended by the criminal deeds – 'massive fraud' – of Stites" and then turn around and "swallow her words and present Stites as an innocent man.").

Assuming Ms. Betancourt obtained one, a waiver in this case do not solve the problem either. Ms. Betancourt has already asserted that she had attempted to contact Miguel Fimbres. In what capacity? She has also asserted that she will not review Miguel Fimbres' prior file. However, how can Miguel Fimbres knowingly and voluntarily waive a conflict without being fully informed as to what he is waiving? How can Ms. Betancourt fully inform Miguel Fimbres without looking at the file?

As the Supreme Court explained in Wheat, "where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that [witnesses] be separately represented." 486 U.S. at 162. It is extremely difficult to ensure that a client has knowingly and voluntarily waived this conflict, as conflicts are often very difficult for an experienced attorney (much less his client) to appreciate: "The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." Id. at 162-63. Thus, "[t]he court may properly exercise this power [to disqualify counsel] partly because defendants may not be able to appreciate the significance of a waiver in light of the potential conflicts." United States v. Wheat, 813 F.2d 1399, 1403 (9th Cir. 1987), aff'd, 486 U.S. 153 (1988). See id. ("Because the conflicts are often subtle it is not enough to rely upon counsel, who may not be totally disinterested, to make sure that each of his joint clients has made an effective waiver.") (citation omitted); United States v. Garafola, 428 F. Supp. 620, 623 (D.N.J. 1977) ("The average defendant cannot possibly understand fully and completely the extent to which his counsel's trial strategy may be affected by his representation of other[s]."); In re Grand Jury Investigation, 436 F. Supp at 822 (calling the waiver "illusory" and holding that "a serious conflict of interest exists in [the attorneys'] representation of [a non-target witness] and that such conflict could not have been properly waived by [the non-target witness]."); see also Wheat, 486 U.S. at 163 ("Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them."). The Supreme Court, the Ninth Circuit, and other

courts of appeals have rejected waivers in analogous situations. See, e.g., Wheat, 486 U.S. at 163-64; Rewald, 889 F.2d at 857 (court refused to accept defendant's waiver of conflict, even though defendant had Sixth Amendment right to his counsel of choice).[5/]

If the Court does not disqualify Ms. Betancourt, it will essentially be crossing its fingers and hoping that the serious conflict that Ms. Betancourt's representation presents does not require a mistrial or a retrial. See, e.g., Elliot; Henke, 222 F.3d at 638. Given the obviously conflict, it may be Ms. Betancourt's desire to give her client two bites at the apple.

As noted above, the Supreme Court, the Ninth Circuit, and courts around the country have repeatedly made clear that the Court has the wide discretion to ensure that such an event does not occur. That is especially true here, where Federal Defenders represented a co-defendant in the previous guilty plea. It is hard to imagine a conflict more clear than this one. As one court has put it: "Disqualification of attorneys late in the proceedings benefits no one — it deprives defendants of counsel who they knew and trust . . . it forces delays while new counsel become acquainted with the case, which harms defendants, the prosecution, and the court." United States v. Stepney, 246 F. Supp.2d 1069, 1084 (N.D. Cal. 2003); see also Kenney, 911 F.2d at 322. Although Cesar Fimbres has a Sixth Amendment right to counsel, that right does not obligate this Court to permit this obvious conflict to persist and blossom. The Court can, and must, exercise its discretion now to eliminate the serious conflicts in this case.

## IV

## THE MOTION TO PRODUCE GRAND JURY TRANSCRIPTS SHOULD BE DENIED

Defendant moves for production of the grand jury transcripts based upon speculation about what might have happened. His motion should be denied.

---

[5/] See also United States v. Allen, 831 F.2d 1487, 1502 (9th Cir. 1987) (holding that defendant did not knowingly or intelligently waive conflict of interest); Mannhalt, 847 F.2d at 581 (to the same effect); United States v. Ross, 33 F.3d 1507, 1524 (11th Cir. 1994) (upholding district court's refusal to accept waiver because of "several actual or potential conflicts of interest"); Lockhart v. Terhune, 250 F.3d 1223, 1232-33 (9th Cir. 2001) (reversing conviction because of ineffective waiver of conflict); United States v. Calabria, 614 F. Supp. 187, 193 (E.D. Penn. 1985) (refusing to accept waiver because defendant "is not aware of the foreseeable prejudice his attorney's continued representation will entail for his trial and the possible detrimental consequences of those prejudices."); United States v. Arnold, 913 F. Supp. 348, 351 (E.D. Penn. 1995) (refusing to take waiver because court could not "begin to project all of the possible conflicts which may arise").

The need for grand jury secrecy remains paramount unless the defendant can show "a particularized need" that outweighs the policy of grand jury secrecy. United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986); United States v. Murray, 751 F.2d 1528, 1533 (9th Cir. 1985). Defendant has not shown a particularized need.

Defendant simply speculates that the instructions to the grand jury might be deficient, and might provide a basis for further motions. However, the Ninth Circuit has held that there is no constitutional right to have any legal instruction provided to the grand jury, United States v. Kenny, 645 F. 2d 1323, 1347 (9th Cir. 1981), so obtaining the grand jury instructions would not in any way help "to avoid a possible injustice" in another legal proceeding, as required under the test set forth by the Supreme Court, in the case of Douglas Oil Co. v. Petrol Stops Northwest, 441, U.S. 211, 222 (1979). As the Supreme Court has stated, "an indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on its merits." Costello v. United States, 350 U.S. 359, 363 (1956).

Moreover, it is well settled that the grand jury may indict someone based on inadmissible evidence or evidence obtained in violation of the rights of the accused. See United States v. Mandujano, 425 U.S. 564 (1976) (indictment brought based on evidence obtained in violation of defendant's right against self-incrimination); United States v. Calandra, 414 U.S. 338, 343 (1974); United States v. Blue, 384 U.S. 251 (1966) (indictment brought based on evidence obtained in violation of defendant's right against self-incrimination); Lawn v. United States, 355 U.S. 339 (1958); Costello v. United States, 350 U.S. 359, 363 (1956) ("neither the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act"); see also Reyes v. United States, 417 F.2d 916, 919 (9th Cir. 1969); Johnson v. United States, 404 F.2d 1069 (9th Cir. 1968); Wood v. United States, 405 F.2d 423 (9th Cir. 1968); Huerta v. United States, 322 F.2d 1 (9th Cir. 1963).

The Ninth Circuit has recognized the grand jury's unique history, secrecy, and role. See United States v. Navarro-Vargas, 408 F.3d 1184, 1188-1201 (9th Cir. 2005). Tracing the history of the grand jury from English common law, the Supreme Court has observed that grand jurors were not hampered by technical or evidentiary laws, and traditionally could return indictments based not on evidence presented to them at all, but on their own knowledge of the facts. See Costello, 350 U.S. at 363. In light

of this tradition, the Court held that "neither the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act," and that grand jury indictments could not be challenged based on the insufficiency or incompetence of the evidence. Id.

Besides Defendant's speculation, there is no basis upon which to dismiss the Indictment due to improper conduct before the grand jury. As such, his request for transcripts should be denied.

## V

## CONCLUSION

For the foregoing reasons, the United States asks that the Court deny Defendant's motions, except where unopposed, limit further motions to those based on new law or facts.

DATED: March 4, 2008

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

*s/Christopher M. Alexander*
______________________________
CHRISTOPHER M. ALEXANADER
Assistant United States Attorney
Attorneys for Plaintiff
United States of America
Email: Christopher.M.Alexander@usdoj.gov

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, Plaintiff,
v.
CESAR RICARDO FIMBRES-PEREZ (1), OLIVIA FIMBRES-PEREZ (2), MIGUEL FIMBRES-PEREZ (3), Defendants.

Criminal Case No. 08CR0021-DMS

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED THAT:

I, CHRISTOPHER ALEXANDER, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of United States' Response to Defendant's Motions to (1) compel discovery/preserve evidence and (2) various grounds to dismiss the Indictment or certain counts, together with statement of facts, memorandum of points and authorities on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

1. Michelle Betancourt, Esq.
   Atty for Defendant Cesar Fimbres

2. Ezekiel Cortez, Esq.
   Atty for Defendant Olivia Fimbres

I hereby certify that I have caused to be mailed the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

None

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 4, 2008.

*s/Christopher M. Alexander*

CHRISTOPHER M. ALEXANDER